David P. Myers (SBN 206137)
dmyers@myerslawgroup.com
Robert Kitson (SBN 214091)
rkitson@myerslawgroup.com
Rudy Balderama (SBN 234602)
rbalderama@myerslawgroup.com
**THE MYERS LAW GROUP, A.P.C.**
9327 Fairway View Place, Suite 100
Rancho Cucamonga, CA., 91730
Phone (909) 919-2027
Fax (888) 375-2102

Attorneys for Plaintiffs DAIRY EMPLOYEES UNION, LOCAL 17

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAIRY EMPLOYEES UNION, LOCAL 17, an unincorporated association, and ASCENCION MARQUEZ an individual,<br><br>    Plaintiffs,<br><br><br>v.<br><br><br>CHRISTIAN LABOR ASSOCIATION OF THE UNITED STATES (CLA-USA)<br><br><br>    Defendant. | CASE NO. 5:21-cv-488<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

## PARTIES & INTRODUCTION

1.  Plaintiff, Ascension Marquez ("Marquez"), is an individual residing in San Bernardino County, California.  Plaintiff Marquez is President of Dairy Employees Union, Local 17.

2.  Plaintiff Dairy Employees Union, Local 17 ("Local 17") is a labor organization within the meaning of 29 U.S.C. §185.  Local 17 represents approximately 40 members employed by various dairy producers located throughout Northern and Southern California.  Local 17's principal office is located at 2555 S. Euclid Ave., Ontario, CA 91762.  Local 17 also maintains its bank accounts, records and property within San Bernardino County, California.

3.  Defendant Christian Labor Association of the United States of America ("CLA") is an international labor organization whose headquarters is located in Michigan.   **CLA's** principal business office is located in 405 Centerstone Court, Zeeland, Michigan 49464.  The CLA is governed by its Constitution, which is attached hereto as **"Exhibit A."**

4.  Local 17's previous affiliation with Defendant CLA was governed by the terms of a charter ("Charter" or "Affiliation Agreement"), which is memorialized by an affiliation agreement dated December 27, 1965.  A true and correct copy of the Affiliation Agreement is attached hereto as **"Exhibit B."**

## NATURE OF THE ACTION

5.  Plaintiff Marquez requests damages, declaratory and injunctive relief under Titles I and III of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§401 et seq., § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, and various other claims for relief set forth below.

6.  This is an action for damages, declaratory relief and to enjoin interference by representatives of Defendant CLA with a democratic vote to

disaffiliate from Defendant CLA.

7. This action is an actual controversy in which Local 17 seeks a declaration of its rights and legal obligations regarding its disaffiliation from Defendant CLA, Defendant's *ultra vires* and retaliatory termination of Plaintiff Marquez from his position as elected President of Local 17 and injunctive relief in the face of Defendant CLA's declared intent to close Local 17's operations and seize its assets, accounts and membership records.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over the Plaintiff's LMRDA claims pursuant to 29 U.S.C. § 412, which provides that suit may be brought in the federal courts for appropriate relief. Plaintiffs also invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

9. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this district, and the property at issue is located within this district. Venue is also proper in this district pursuant to 29 U.S.C. §§185(a) and 412 in that the principal office of Local 17 is located in this district and it is in this district that Plaintiff Marquez and Local 17's members were denied their rights pursuant to actions taken by the Defendant CLA. Venue is also proper in this district in that it is in this district that the duly authorized officers of Local 17 are engaged in representing and acting for the members of Local 17.

10. Venue is proper as a substantial part of the property and material that is subject to dispute is located in the County of San Bernardino, California. 28 USC § 1391 (b)(2).

///

///

# FACTUAL ALLEGATIONS

11.    Historically, Local 17 has collectively bargained and enforced its own labor contracts on behalf of its membership independently and without the assistance of Defendant CLA or any other entity.  Even after the effective date of its affiliation with Defendant Local CLA, Local 17 continued to represent its members without the involvement of Defendant CLA.

12.    The affiliation between Defendant CLA and Local 17 was largely nominal.  The lack of Defendant CLA's involvement in supporting Local 17's representational activities had rendered the affiliation little more than a symbolic association.  By the same token, the disaffiliation of Local 17 from CLA will result in minor financial repercussions due to the minimal interrelationship between the two entities.

13.    Historically, Local 17's general treasury has come exclusively from its membership and its Health and Welfare Fund. Local 17's principal interaction with Defendant CLA has been limited to the transmittal of a relatively modest proportion of Local 17's membership dues.  Local 17 has customarily paid approximately 19% of its membership dues to Defendant CLA.   This lack of interdependence stands in stark contrast to the relationship that Defendant CLA maintains with other affiliates, as reflected by the fact that Defendant CLA collects 82% of the membership dues of other affiliates.

14.    Local 17 has assumed responsibility for responsibly acting on behalf of its members, maintaining its own health and welfare fund, and paying the cost of its elected officer salaries and stipends with no guidance or support from Defendant CLA.

15.    Plaintiff Marquez was hired by Local 17 and, for its part, Local 17 is alone responsible for paying the salaries of its elected President. Plaintiff Marquez is not and has never been an employee of Defendant CLA.

16.     Plaintiff Marquez is informed and believes that his relationship with Defendant CLA is far different than the relationship between Defendant CLA and officials from other CLA affiliates who, by contrast, have their pay, terms and conditions dictated and controlled by Defendant CLA.

17.     In recent months, Local 17's membership complained to Plaintiff Marquez about the unproductive relationship between Defendant CLA and Local 17.  In addition, Plaintiff Marquez has faced increasing pressure from his local union constituents over the unconstitutional and arbitrary practices perpetrated by Defendant CLA and its representatives.

18.     On or about October 5, 2020, Plaintiff Marquez reached out to the leadership of other CLA affiliates to discuss their joint concerns, including their belief that Local 17 and other affiliates lacked any meaningful voice within Defendant CLA due to the latter's arbitrary, unconstitutional and undemocratic practices, the deteriorating relationship and animosity between Defendant CLA and the leadership of other affiliates, and the perceived futility of seeking positive change from within the existing hierarchy of Defendant CLA.   Faced with increasingly widespread dissatisfaction with the status quo among the local union membership, in conjunction with the perceived futility of seeking positive change from within Defendant CLA, Plaintiff Marquez reached an agreement with others that a disaffiliation would likely serve the interests of Local 17's membership.

19.     Plaintiff Marquez reasonably understood that the Constitution and Charter placed no prior restraint on Local 17's members' right to disaffiliate from Defendant CLA.  Accordingly, on or about October 19, 2020, Plaintiff Marquez conferred with Local 17's executive board and reached a unanimous agreement in favor of disaffiliating from Defendant CLA.

20.     On November 17, 2020, Plaintiff Marquez, together with the local officers of certain Michigan-based local union affiliates, including locals 10, 12,

18 and 25, reached an agreement with Local 17 and Plaintiff Marquez to present a letter that formally announced their resolution to disaffiliate from Defendant CLA and, further, proposed that the parties agree to a peaceable and orderly method of addressing the issue of disaffiliation.  A true and correct copy of the November 17th Letter is attached hereto as **Exhibit C**.  The November 17th Letter commenced with the declaration that it had been prepared "on behalf of Locals 10, 12, 17, 18 and 25."  The November 17th letter provides a detailed history regarding the deteriorating relationship between the locals and Defendant CLA and closed with the following notice and declaration of intent:

> Given all of the above considerations, the Michigan and California locals no longer wish to be in a relationship where the parties continue in perpetual conflict.  It is clear from repeated failures that the Minnesota leadership is no longer interested in following the Constitution and bylaws. We have concluded that Minnesota would be much better off on its own, apart from Michigan and California.  After researching the Constitutional bylaws, we find there is nothing prohibiting a separation.  The Michigan and California offices hereby declare intent to separate relations from the Minnesota region.

> To minimize legal expense and equitably conclude the proposed separation, we suggest the regions appoint an agreed-upon number of representatives to begin the process of separation.  We also propose engaging the services of an agreed-upon mediator to avoid Court proceedings, as it is costly.  We sincerely believe that a separation is in the best interest all regions.

21.    Subsequent to receiving the above-referenced letter, on November 17, 2020, Defendant CLA proceeded with its regularly scheduled national board meeting, via Zoom, with Plaintiff Marquez and others in attendance.  At this meeting, Defendant CLA's representatives refused to issue any response or acknowledgement of receipt of the November 17th letter.  Instead, Defendant CLA's representatives commenced what has become a long-standing and continuing campaign of reprisals designed to destabilize the afore-mentioned

dissident locals who joined together in challenging the affiliation with Defendant CLA.

22.    At its November 17th national board meeting, Defendant CLA announced that it would (1) terminate Plaintiff Marquez from his elected position as Local 17's president, (2) shut down Local 17's office and operations, and (3) demand the forfeiture of Local 17's books and accounts.  This announcement came as a complete shock to Plaintiff Marquez and others in attendance, as Defendant CLA had failed to give any prior notice of these decisions.  At the time, Defendant CLA's had informed the participants of the board meeting agenda that it had planned only to consider the issue of Plaintiff Marquez's pending grievance over the issue of a reprimand that had been issued in a prior meeting. In a terse, scripted statement read out by Defendant CLA's National Secretary, Mark Vosberg, Plaintiff Marquez was informed that he would be required to close Local 17's offices by the end of January 31, 2021, and hand over all assets and records belonging to Local 17. In his written statement, Mr. Vosberg announced that Plaintiff Marquez would continue to pay himself his salary out of Local 17's funds until January 31, 2021.

23.    Defendant CLA's decision to terminate Plaintiff Marquez was a legal nullity or, in the alternative, was *ultra vires* such that the deprivation of his employment-related rights was devoid of any authority on the part of Defendant CLA.  Defendant CLA had never assumed or exercised the authority to hire, fire or otherwise direct or control the terms and conditions of Plaintiff Marquez's employment.  Local 17 has historically retained full authority over the employment, compensation, and terms of its elected officers.  Consequently, Defendant CLA's decision to remove Plaintiff Marquez was void and of no legal effect.

24.    Defendant CLA's declared intent to shut down Local 17's office and

operations was similarly an *ultra vires* act and, therefore, void and of no legal effect. From the outset, and prior to Defendant CLA's planned acts of reprisal, Plaintiffs had already effectively disaffiliated from Defendant CLA, as reflected in their joint authorization of the November 17th letter, notifying Defendant CLA of their separation from Defendant CLA.

25. In addition, Defendant CLA's announced decisions to shut down Local 17's office and strip its assets, accounts and membership records, was an act undertaken in excess of the authority it previously held under the governing documents that had previously defined and controlled Defendant CLA's prior affiliation with Local 17. For its part, Defendant CLA has not even tried to create the appearance that they were acting in accordance with any of their governing documents. On the contrary, Defendant CLA's announced decisions were plainly in breach of the parties' governing documents because, among other things, they were presented to Local 17's membership as *fait accompli*, and in direct contravention of the Plaintiffs' rights to disaffiliate from Defendant CLA had been preserved within the express terms of the governing documents representing the parties' affiliation agreement.

26. Defendant CLA's announced acts of reprisal were deficient in both form and substance. On its face, the Defendant CLA's manner of presenting the termination of Plaintiff Marquez and the subsequent shutdown of Local 17 were presented, reviewed and agreed upon by select members of Defendant CLA's leadership who had privately reached a regarding these acts prior to the commencement of the November 17th board meeting. By deliberately engaging in a pattern of circumventing and excluding the Plaintiffs and fellow local labor affiliates from meaningful participation in the national democratic decision-making process, Defendant CLA violated the democratic guarantees in the CLA Constitution and, thus, frustrated the purposes of the Local 17's continued

affiliation with Defendant CLA.

27.     On wholly independent legal grounds, Defendant CLA's efforts to terminate Plaintiff Marquez and shut down Local 17's operations constituted acts of unlawful reprisal premised on Plaintiff Marquez's protected representational activities on behalf of Local 17's membership.  As discussed *infra*, and throughout this pleading, Defendant CLA was prohibited from interfering with Local 17's members' statutory rights guaranteed under the LMRDA, including, *inter alia*, their exercise of free speech, rights to select a representative of their choosing and rights to non-association under the LMRDA.

28.     There exists a demonstrable causal link between the termination decision being announced by Defendant CLA and acted upon the very same day Plaintiff Marquez notified Defendant CLA of Local 17's intent to disaffiliate. The purported reprisal termination constituted an act of interference designed to chill the Local 17's members' exercise of their rights to free speech and free association guaranteed under Section 101 of the LMRDA.   As such, this Court's involvement is necessary to prevent Defendant CLA from continuing in its efforts to intimidate Local 17's members' exercise of their statutory rights to non-association under the LMRDA (29 U.S.C.S. § 411), free speech under Title I of the LMRDA, and Section 7 of the National Labor Relations Act (29 USC § 157).

29.     Further underscoring its unlawful retaliatory motive animating Defendant CLA's actions, Defendant CLA also announced at its November 17th board meeting that it would terminate Mr. Clarence Merrill from, *inter alia*, his position as elected local union president of Local 10, a Michigan-based affiliate labor union.  At the time, Mr. Merrill was suspected by Defendant CLA of having actively participated together with Plaintiff Marquez in the preparation and submission of the November 17th letter announcing the planned disaffiliations of their respective local unions.  Proceeding in precisely the same fashion as it had

with regard to Plaintiff Marquez, Defendant CLA further notified Mr. Merrill that he would be ordered to close down his local union's offices and hand over control of the local's books and assets.

30.     Beginning sometime on or about December 15, 2020, and continuing on to the present, Defendant CLA's representatives have participated in a series of *extra-judicial* actions designed to defund the financial accounts and assets of local unions 10, 12, and 18.  Even up until the present, Defendant CLA has continued to target these local unions with the objective of shutting down operations without any attendant due process or judicial court order.  Defendant CLA's course of conduct has been pursued haphazardly and with reckless disregard for the rights of impacted local union members, who have been left leaderless and without anyone or entity assuming the continued responsibility of representing their collective interests.  As discussed *infra*, this overall course of conduct has led to the loss of membership support, with many members choosing to walk away in view of the chaos, disorder and uncertainty created by Defendant CLA and their reckless disregard for their fiduciary obligations or the corresponding interests and rights of these aggrieved members.

31.     Based on Defendant CLA's recent pattern of conduct, Plaintiffs believe with a reasonable certainty that Local 17's membership faces an imminent threat of irreparable harm if Defendant CLA is allowed to proceed unhindered with its stated plans to shut down and seize Local 17's accounts, assets and membership information.  Defendant CLA conduct presents a credible threat to Local 17's membership's interests in the continued functioning of its local union.  Defendant CLA's threat of action alone has constituted a prohibited chilling impact on the free exercise of the Plaintiffs' members' rights.  The threat posed by Defendant CLA's in its planned shutdown of Local 17 is sufficiently credible and destructive in nature as to warrant an injunctive order restraining Defendant

CLA's from acting in conformity with its threatened actions.

32.   Based on Defendant CLA's conduct against other local affiliates that joined Plaintiffs in supporting disaffiliation, Plaintiffs reasonably believes that any efforts to peacefully resolve disputes with Defendant CLA will be futile.  As noted, Defendant CLA presented the reprisals as faits accompli and, moreover, have done little to hide the fact that they are punishing local unions for expressions of lawful dissent.  Absent the court's prompt and timely intervention, Defendant CLA conduct will irreparably harm Local 17's members' free exercise of democratic rights guaranteed under the LMRDA by, among other things, stripping them of their duly elected leadership, stripping their local union of its resources needed to continue to represent their interests, and forcing their local union out of existence.  By contrast to Defendant CLA, Plaintiffs fully intend to responsibly fulfill their duties to represent its members.  In order to protect Local 17's members, Plaintiffs must secure a court order restraining Defendant CLA from disabling the Plaintiffs' present capacity to represent of Local 17's membership.

33.   At this time, Local 17 remains a viable labor organization with its resources intact.   To begin, Plaintiffs request a declaration by this court restraining Defendant CLA from interfering with Plaintiff Marquez's employment and status as Local 17's duly elected president.  Plaintiffs further request that this Court issue a remedial order, declaring Defendant CLA's announced termination of Plaintiff Marquez as null and void as well as an unlawful act in violation of the statutory protections of the LMRDA.

34.   The parties originally affiliated sometime on or about April 9, 1949, as two separate and independent labor unions.   Prior to its affiliation with Defendant CLA, Local 17 was an autonomous entity with its own financial resources and its own body of members.  The historical record strongly supports

the Plaintiffs' present efforts to retain their autonomy and control over their resources and decision-making.

35.    Although Local 17 agreed to be bound by Defendant CLA's Constitution and Charters, Local 17 remained an independent and autonomous entity with financial assets and records held separate and apart from Defendant CLA. Over the course of their relationship, Local 17 has retained its character as an independent and autonomous entity with discretion over the disposition of its resources and personnel.

36.    To underscore the unique realities of the parties' financial interrelationship, Local 17 has not been required to fulfill the same dues obligation paid by other affiliates.  Local 17 pays a comparably smaller fraction of its membership dues obligations to Defendant CLA than paid by other local affiliates.  Furthermore, Local 17 has retained sole and exclusive responsibility over the payment of all local union personnel and membership benefits. Defendant CLA acknowledged at its November 17th board meeting that Plaintiff Marquez would be authorized to continue to pay himself his salary until January 31, 2021.  Since that time, Defendant CLA has not acted to assume the financial obligations of Local 17's operational costs or benefits of representing the interests of Local 17's members.  The record thus far reflects no indication on the part of Defendant CLA that it seeks to responsibly assume the mantle of representing Local 17's members.

37.    The parties' preservation of the right to disaffiliate in their governing documents would necessarily be rendered illusory if Defendant CLA were authorized to unilaterally seize the assets, accounts, and membership information of Local 17.  This Court should act to restrain Defendant CLA from hijacking the financial accounts and assets of Local 17.  This holds particularly true where, as here, Defendant CLA has engaged in a pattern of unilaterally confiscating and

disposing of the assets of other local unions affiliates and leaving them unable to function and represent the interests of their members.  The Court's intervention is further required to counteract the confusion and chilling impact posed by Defendant CLA's seizure of local union assets without any modicum of due process of law.  The message being sent by Defendant CLA's confiscation of assets is that the choice of disaffiliating is punishable by the *de facto* closure and dissolution of the local union, as well as the retaliatory removal of the union members' choice of local union representatives.

38.   Since the time of its affiliation, Local 17 has retained independent title to its assets.  At no time has Local 17 expressly or impliedly granted title to its assets over to Defendant CLA.

39.   Nothing in the Affiliation Agreement purports to infringe upon or negate the right of Local 17 to disaffiliate from Defendant CLA.  For its part, Defendant CLA has no right to undermine Local 17's disaffiliation.  As such, and to ensure that Local 17's disaffiliation will not prejudice its members or pose any detrimental impact upon Local 17's ability to protect its membership or enforce breaches of its existing collective bargaining agreements with employers.  By contrast, Local 17 anticipates that the additional dues income that would otherwise be diverted to Defendant CLA will allow Local 17 to fulfill its obligations to protect and represent the interests of its members.

40.   On January 26, 2021, Local 17 conducted an election among its members regarding the decision to disaffiliate from Defendant CLA.  The outcome of the election was finalized on February 18, 2021, with a majority vote of Local 17's membership voting in favor of disaffiliation from Defendant CLA.  At this critical juncture, Plaintiffs seek an injunction preventing the Defendant CLA from interfering with the results of Local 17's disaffiliation election by its continued attempts to displace its leadership and seize the records and bank

accounts held in the name of Local 17.  Defendant CLA has demonstrated a willingness to trample upon the democratic will of the local union memberships as recently reflected in Defendant CLA's ongoing refusal to release membership contact information of Local 10's membership solely for the strategic and unlawful objective of preventing a disaffiliation election.

41.   The Plaintiffs also seek declaratory relief from the Court regarding the resolution of any and all claims and disputes over the disposition, custody and control of Local 17's assets through an orderly judicial determination. Such injunctive and declaratory relief is essential because Local 17 relies on its assets and its leadership to competently and effectively represent its members.

42.   Defendant CLA's blanket demand for the seizure of Local 17's assets, together with its repeated efforts to seize the books and accounts of other local unions creates a case and controversy regarding the disposition of orderly Local 17's assets.  This court is empowered to act to prevent Defendant CLA's seizure of Local 17's assets in the interests of the membership, particularly given the fact that Defendant CLA has undertaken to shut down affiliate local unions without any contingency plans to represent the interests of the members.  Over the past few months, Plaintiffs have learned that Defendant CLA has extra-judicially stripped the resources and leadership, while concomitantly failing and refusing to assume responsibility for the representational obligations of the disenfranchised membership and, further, failing and refusing to make any effort to communicate with the membership of the impacted local unions.   This pattern of abuse has naturally and foreseeably resulting in the loss of members and poses a grave danger to Local 17 and the welfare of its membership.

43.   The Plaintiffs have no adequate remedy at law.

44.   The Plaintiffs have exhausted all applicable internal and/or administrative remedies.

45.    There exists no viable internal union appeals process applicable to the disputes relating to or arising from this lawsuit.  Moreover, Defendant CLA's recent course of conduct and acts reprisals have established the futility of seeking to exhaust any such internal appeals measures, even were they to exist.

### FIRST CLAIM FOR RELIEF

PLAINTIFFS' CLAIM FOR VIOLATION OF THE LMRDA, SECTION 101

(29 U.S.C. § 411)

(RETALIATORY TERMINATION OF ELECTED UNION OFFICER)

46.    The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

47.    Section 101(a)(1) of the LMRDA recognizes the equal right of union members to participate in the deliberations and voting at union meetings, and the guaranty and Section 101(a)(2) of the LMRDA recognizes union members' right to express views and right to assemble, consult and decide matters of concern to the local union without the inhibiting presence and/or control by international officials.  LMRDA, 29 U.S.C.S. § 411.

48.    The Defendant CLA has unlawfully chilled the free expression of Local 17's members' rights to free speech and assembly by instituting a retaliatory decision to discharge Plaintiff Marquez from his elected position as president of Local 17.

49.    By removing Plaintiff Marquez from his elected office, Defendant CLA has deprived Plaintiffs and all members of Local 17 of their right to participate in the democratic self-governance of their union in violation of section 101(a) (1) of the LMRDA, 29 U.S.C. § 411(a)(1). In addition, Defendant CLA denied Plaintiff Local 17's members of their right "to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the Labor organization his views, upon candidates in an

election of the Labor organization or upon any business properly before the meeting ..." in violation of § 10l(a)(2) of the LMRDA, 29 U.S.C. § 411(a) (2).

50.   Defendant CLA has acted as part of a general campaign to suppress dissent within Local 17 through the suspension of Plaintiff Marquez and threatening and demanding the seizure of Local 17's records and assets.

51.   The Defendant CLA suspended Plaintiff Marquez in an effort to eliminate the principal voice of opposition within Local 17 and, further, to intimidate all Local 17 members so that they would not express views contrary to those of Defendant CLA.  To prevent Plaintiff Marquez from speaking freely on matters of concern to Local 17 members; to intimidate Local 17 members into remaining silent on such matters; to punish Plaintiff Marquez for speaking freely with respect to Defendant CLA's unconstitutional acts, advocating Local 17's disaffiliation from Defendant CLA, and other matters of concern to Local 17's members, Defendant CLA has purported to permanently deprive Local 17 and its membership of its duly elected by Local 17's membership.

52.   Plaintiff Marquez requests a declaration by this Court affirming that Defendant CLA's decision to terminate him from his duly elected position as president of Local 17 was done unlawfully in contravention of the LMRDA and without any authority to do so.

53.   Plaintiff Marquez, Plaintiff Local 17 and the Local 17's membership have been and will continue to be injured by Defendant CLA's acts of reprisal against Plaintiff Marquez. Plaintiff Marquez's and Local 17's members' exercise of free speech rights has been impaired, and the willingness and ability of Local 17's members to exercise such rights has been chilled.

54.   Defendant CLA's unlawful reprisals have caused Plaintiff Marquez to suffer substantial humiliation, anxiety and emotional distress.

///

## **SECOND CLAIM FOR RELIEF**

PLAINTIFF LOCAL 17'S CLAIM TO DECLARE ITSELF DISAFFILIATED
FROM DEFENDANT CLA

(LMRA SECTION 301)

55.     The foregoing allegations of paragraphs 1-44 are repeated and
realleged as if fully set forth herein.

56.     As a general rule of law, local unions can disaffiliate at any time
absent express agreements to the contrary.

57.     Nothing in the Constitution or Charter impeded or restrained Local
17's right to disaffiliate from Defendant CLA.  Moreover, Local 17 has never
explicitly or implicitly forfeited its right to right to disassociate from Defendant
CLA at any time and for any reason.

58.     On or about November 17, 2020, Plaintiff Marquez notified
Defendant CLA that Local 17 intended to disaffiliate from Defendant CLA.

59.     Defendant CLA responded by illegally terminating Plaintiff Marquez
and demanding control of Local 17's records and assets.

60.     On February 18, 2021, Local 17 concluded the outcome of its election
concerning the continued affiliation with Defendant CLA, resulting in a majority
of the membership voting in favor of disaffiliating from Defendant CLA.

61.     Defendant CLA's unlawful acts constituted a repudiation of the
Charter by which Defendant CLA maintained its affiliation with Local 17.  By and
through its conduct, Defendant CLA is further estopped from denying the
disaffiliation of Local 17.

62.     Plaintiffs request that the Court declare Local 17 validly disassociated
from Defendant CLA upon the Defendant CLA's unlawful scheme to eliminate
Local 17's leadership and seize control of Local 17's assets.

///

## THIRD CLAIM FOR RELIEF

PLAINTIFFS' CLAIM TO DECLARE THE TERMINATION OF PLAINTIFF MARQUEZ TO BE AN *ULTRA VIRES* ACT IN VIOLATION OF ITS CHARTER AND CONSTITUTION

(LMRA SECTION 301)

63.   The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

64.   At all relevant times, Local 17 has had the exclusive power, right and authority to elect and employ the president of Local 17.   Plaintiff Marquez was duly elected as Local 17's president and has continuously fulfilled his obligations as the president of Local 17.

///

65.   The Charter and Constitution preserved the right of Local 17 to retain the right of self-governance in regard to its internal affairs and relationship with Defendant CLA.

66.   On November 17, 2020, Defendant CLA unlawfully intervened into Local 17's internal affairs by declaring Plaintiff Marquez's employment terminated.

67.   Defendant CLA lacked the authority to terminate Plaintiff Marquez's position as the elected president of Local 17 and, thus, acted in excess of its authority under the Charter and Constitution by terminating Plaintiff Marquez.

68.   Plaintiffs request that this Court issue a declaration recognizing Plaintiff Marquez as the duly elected president of Local 17 and, further, injunctive relief ensuring that he will be allowed to carry out his duties without harassment or interference.

69.   Plaintiffs further seek a declaration that Defendant CLA has unlawfully restrained and coerced Plaintiffs in the exercise of their rights under

the LMRDA, and have unlawfully retaliated against them for exercising such rights.

70.     The Plaintiffs further request injunctive relief to prevent the Defendant CLA from taking further reprisals against the Plaintiffs and Local 17's membership.

### FOURTH CLAIM FOR RELIEF
PLAINTIFFS' CLAIM TO DECLARE THAT THE CHARTER AND CONSTITUTION IS VOID DUE TO DEFENDANT CLA'S BREACH OF THE COVENANTS OF GOOD FAITH AND FAIR DEALING

71.     The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

72.     Defendant CLA has caused a breach of the implied covenant of good faith and fair dealing inherent Constitution and Charter by engaging in arbitrary and bad-faith conduct which has had the effect of preventing Local 17 and its membership from receiving the fruits of the Charter and Constitution and/or freely exercising their rights and guarantees as an affiliate of Defendant Local 17

73.     Defendant CLA has breached the covenant of good faith and fair dealing implied in Defendant CLA of the Constitution and Affiliation Agreement when Defendant CLA arbitrarily refused to grant the Plaintiffs' request to disaffiliate from the Defendant CLA.

74.     Defendant CLA has breached the covenant of good-faith and fair dealing by repeatedly engaging in conduct that frustrated the intent underlying the Charter and Constitution, including the implied duties to, *inter alia*, refrain from suppressing the free expression of dissent among members of Local17, refrain from removing the elected president of Local 17 without cause or in retaliation for his free expression of protected speech, refrain from failing to act in the best interests of Local 17 in regard to the utilization and expenditure of Local 17's dues payments, and refrain from invading the exercise of self-governance and

decision-making authority of Local 17's leadership.

75.     On November 17, 2020, and after receiving notification of Local 17's intent to disaffiliate, Defendant CLA convened a meeting to institute a pre-arranged decision to terminate Plaintiff Marquez which are blatantly unconstitutional. Despite Defendant CLA's efforts, Local 17 held and concluded an election among its members, with the majority choosing to disaffiliate from Defendant CLA.

76.     This conduct further demonstrates Defendant CLA has manifestly breached the covenants of good faith and fair dealing that are inherent in the Charter and Constitution.

77.      Defendant CLA's present extra-judicial efforts to seize the bank accounts of other dissident local union affiliates further demonstrates that the Defendant CLA is running roughshod over the Charter and Constitution in an effort to chill the free exercise of speech and union democracy by Local 17's membership.

78.     Plaintiffs request that the Court find that the breaches of the covenant of good faith and fair dealing committed by Defendant CLA, as described in this Complaint, have rendered the Charter and Constitution void and unenforceable as to Local 17 and, further, have rendered any possibility of an orderly or peaceable resolution of conflict between Defendant CLA and Plaintiffs completely illusory and futile.

## FIFTH CLAIM FOR RELIEF

PLAINTIFFS' CLAIM TO DECLARE THE CHARTER AND CONSTITUTION VOID DUE TO THE FRUSTRATION OF PURPOSES

79.     The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

80.     The merger between Local 17 and Defendant CLA has failed in its

essential purposes. The purposes of Local 17's merger with Defendant CLA was to ensure that Local 17 maintain autonomy and fair governance and for Defendant CLA to fulfill its fiduciary duties to Local 17 and its membership.

81.   Local 17 originally affiliated with Defendant CLA in order to improve its collective bargaining power.  Over time, Defendant CLA failed to act in the best interests of Local 17 and its membership.

82.   The merger of Defendant CLA and Local 17 has failed in its essential purposes. The purposes of the affiliation were to build a strong and sustainable relationship between Defendant CLA and Local 17 that would empower and enhance the collective bargaining power of Local 17.

83.   In recent years, Defendant CLA has failed to provide any meaningful support for Local 17 in regard to its collective bargaining and representational activities.  Concomitantly, Defendant CLA has assumed a policy of internal factionalism that has left Local 17 and its members in a completely marginalized position relative to Defendant CLA's decision-making hierarchy.

84.   Defendant CLA has undermined Local 17's autonomy by using fraud and deceit to subject Local 17 to an unfair and unequal partnership with Defendant CLA by and through the establishment and maintenance of undemocratic and unconstitutional processes that have operated contrary to the interests of Local 17's members.

85.   Recognizing the fact that Local 17's members have become marginalized and disaffected, Plaintiff Marquez and other affiliate union leaders notified Defendant CLA that Local 17 sought to disaffiliate from Defendant CLA. In response, Defendant CLA took the extraordinary and unlawful step of terminating Plaintiff Marquez in order to solidify their political control over Local 17 and eliminate any opposition to their schemes.

86.   Defendant CLA's efforts to frustrate the purposes of the affiliation

have completely and substantially destroyed the basis of the Charter and Constitution, as both parties understood the initial terms and intent of the Charter.

87.    Defendant CLA has disregarded its original duty and obligations to act in the best interests of Local 17's membership.  Local 17's membership has responded by voting in favor of disaffiliating from Defendant CLA.

88.    In light of Defendant's recent threat to terminate Plaintiff Marquez and seize Local 17's assets, Plaintiffs anticipate more reprisals by the Defendant CLA against Local 17 that threaten to undermine the orderly separation of the two entities.

89.    The conduct by Defendant CLA in frustrating the purposes of the Charter and the Constitution renders the Constitution void and unenforceable against Local 17.

## SIXTH CLAIM FOR RELIEF

PLAINTIFF LOCAL 17's CLAIM FOR

VIOLATIONS OF THE CHARTER AND CONSTITUION

(LMRA SECTION 301)

90.    The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

91.    The Defendant CLA's actions described above constitute a breach and violation of the Charter and Constitution between Local 17 and Defendant CLA.

92.    The Defendant CLA has breached Section 301of the LMRA by violating the terms of the Charter and in particular, the provision which preserves the right of Local 17 to disaffiliate from Defendant CLA without forfeiting exclusive control over its books, property, and assets.  Nothing in the Charter or Constitution purports to infringe upon the right of Local 17 to disaffiliate from Defendant CLA.

93.     Defendant CLA's effort to most recent assault against Local 17 constitutes a repudiation of the Charter and Constitution.  By seeking to terminate Plaintiff Marquez and seize Local 17's treasury, Defendant CLA has acted solely in service of interests antagonistic to the free democratic expression of Local 17's members.

94.     The demands that Local 17 surrender its assets to Defendant CLA, along with the unconstitutional and retaliatory acts by Defendant CLA show that there exist irreconcilable differences between Defendant CLA and Local 17.

95.     The foregoing actions are causing and will continue to cause irreparable harm to the conditions for self-government in Local 17 and the rights of members and officers to speak and express their views and to act through representatives of their own choosing.

96.     In accordance with Local 17's disaffiliation election, Local 17 seeks a declaration and ruling by this court confirming that Local 17 has ceased to be an affiliate of Defendant CLA.  Furthermore, the Court is asked to declare the Charter dissolved and, furthermore, is asked to adjudicate an equitable distribution of the assets in Local 17's treasury.

97.     Plaintiffs seek injunctive and declaratory relief on the grounds that they are entitled to, at minimum, a judicial determination as to whether Local 17's disaffiliation has taken effect and, further, to determine whether such disaffiliation shall entitle Local 17 to retain a fair and equitable distribution of its assets upon its disaffiliation.

///

///

///

///

///

## SEVENTH CLAIM FOR RELIEF

DECLARATION THAT DEFENDANT CLA'S CHARTER AND CONSTITUTION ARE VOID AS TO LOCAL 17 ON ACCOUNT OF DEFENDANT CLA'S UNCLEAN HANDS

(UNCLEAN HANDS)

98.    The foregoing allegations of paragraphs 1-44 are repeated and realleged as if fully set forth herein.

99.    The conduct of the Defendant CLA has been and continues to be reprehensible.

100.  The Defendant CLA's representatives have demonstrated unclean hands in many ways described hereinabove in this Complaint.

101.  Defendant CLA has acted with unclean hands by removing Local 17's duly elected president, Plaintiff Marquez without contractual authority and in violation of law. Defendant CLA has acted with unclean hands by purporting to discharge Plaintiff Marquez under false pretenses.

102.  The Defendant CLA's unclean hands constitute a basis for the entry of an order precluding Defendant CLA from interfering with the assets or operations of Local 17 in light of its membership's majority vote in favor of disaffiliation.

## PRAYER FOR RELIEF

Plaintiffs request that this Court enter an Order and Judgment providing Plaintiffs with the following relief:

1. Declaring that the disaffiliation election voted on by the members of Local 17 was valid and effective and that Local 17 is no longer affiliated with Defendant CLA;

2. Declaring that the Charter and Constitution are unenforceable and void as to Local 17;

3. Declaring that Defendant CLA is estopped from the invoking the Charter or Constitution as imposing any affiliation between Local 17 and Defendant CLA.

4. Declaring that Defendant CLA's termination of Plaintiff Marquez was an *ultra vires* act and/or an unlawful act in violation of the LMRDA,

5. Declaring that Local 17 shall henceforth be named and recognized as "Dairy Employees Union, Local 17," and independent labor organization, and not "Dairy Employees Local 17, Christian Labor Association of the United States";

6. Enjoining Defendant CLA from interfering with Plaintiff Marquez's duly elected position as president of Local 17,

7. Enjoining Defendant CLA from doing or permitting anything to be done that interferes with the disaffiliation of Local 17 from Defendant CLA;

8. Enjoining Defendant CLA from interfering in any of the affairs (including administrative, financial or collective bargaining) of Local 17 and its membership;

9. Enjoining Defendant CLA from seizing Local 17's assets or bank accounts,

10. Ordering Defendant CLA and its representatives to refrain from any actions that will interfere with Plaintiffs' free speech and assembly and equal rights under the LMRDA;

11. Enjoining Defendant CLA from interfering in any way with Local 17's internal affairs and representational activities on behalf of its members.

12. Awarding Plaintiff Marquez damages to redress the harms that he and Local 17's membership have suffered as a result of the unlawful conduct by the Defendant CLA.

13. Awarding Plaintiffs the costs and disbursements of this action including, to the extent warranted, reasonable attorneys' fees and costs;

14. An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

15. Awarding Plaintiffs compensatory damages in an amount to be determined, and

16. Such other and further relief as is just and proper.


Dated: March 19, 2021            **THE MYERS LAW GROUP, A.P.C.**


By:  /s/ Robert Kitson
        David P. Myers
        Robert Kitson
        Rudy Balderama
        Attorneys for Plaintiffs


## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: March 19, 2021            **THE MYERS LAW GROUP, A.P.C.**


By:  /s/ Robert Kitson
        David P. Myers
        Robert Kitson
        Rudy Balderama
        Attorneys for Plaintiffs

# Exhibit A

**Table of Contents**

Page Number

**Article I.**    **Name.**                    1
     1.    Name

**Article II.**    **Basis.**                    1
     2.    Basis

**Article III.**    **Aim.**                    1
     3.    Aim

**Article IV.**    **Principles.**              1
     4.    Principles

**Article V.**    **Practices.**               1
     5.    Practices

**Article VI.**    **Membership.**           2
     6.    Membership
     7.    Transfer of Membership
     8.    Retention of Membership after Relocation
     9.    Termination of Membership

**Article VII.**    **Government and Administration.**      3
    10.    Convention
    11.    Delegates to Convention
    12.    Voting at the Convention
    13.    Voting by Convention Delegates
    14.    Membership attendance at the Convention
    15.    Arrangements for the Convention
    16.    Proposals for the Convention

**Article VIII.**    **National Board.**          4
    17    National Board Membership
    17(a) Chairperson's Power and Duties
    18.    National Board Duties
    19.    National Board Actions
    20.    National Board Member Elections
    21.    National Board Meetings
    22.    National Board Emergency Action
    23.    National Board Voting
    24.    National Board Member Compensation

**Article IX.**    **National Board of Directors.**      6
    25.    National Board of Directors Composition

Page Number

26.  National Board of Directors Duties                          6
27.  National Board of Directors Meetings
     **Officers - Powers and Duties**                           7
28.  President's Powers and Duties
29.  Secretary's Powers and Duties
30.  Treasurer's Powers and Duties
31.  Vice President's Powers and Duties
32.  Assistant Secretary/Treasurer's Powers and Duties
33.  a.  Election of National Officers
     b.  National Officers Nominations
     c.  National Officers Rights
     d.  National Officers Compensation

**Article X.     Subordinate Units**                            8
34.  Locals' and Councils' Authority
35.  Local By-Laws
36.  Charters of Affiliation
37.  Delinquent Locals
38.  Creation of Locals
39.  Duty of Locals
40.  Local Officers
41.  Election of Local Officers
42.  Duties of Officers
     1. President's Duties
     2. Secretary's Duties
     3. Treasurer's Duties
     4. General Assistant's Duties
43.  Meetings - Locals
44.  District Councils
45.  District Councils Composition
46.  Board of the Council
47.  District Council Meetings
48.  District Council Expenses

**Article XI.     Elections - All Christian Labor Association Units**     12
49.  Elections by Secret Ballot
50.  Nomination of Candidates
     1. Membership Requirements
     2. Candidate Qualifications
51.  Nomination Opportunity
52.  (a) National Offices Nominations
52.  (b) Notice of Nominations
53    Ballots Opened and Counted
54.  Winning an Election

Page Number

55.  Election of National Officers                        13
56.  Election of Convention Delegates & National Bd. Members
57.  Vacancy of an Elected Position
58.  Succession of Officers
59.  Property and Records
60.  Removal of Officer

**Article XII.**  **Representatives.**                        14
61.  National Representatives
62.  Local Representatives
63.  National and Local Representatives Duties

**Article XIII.** **Strikes.**                                15
64.  Strikes

**Article XIV.** **Order of Business.**                       15
65.  Agendas of Meetings

**Article XV.**  **Amendments.**                              15
66.  Amendments to the Constitution

**Article XVI.** **Finances.**                                15
67.  Fiscal Year
68.  Officers Authorization
69.  Annual Audit of Locals
70.  Annual Audit of the Christian Labor Association
71.  Initiation Fees
72.  Membership Dues
73.  Christian Labor Association Retention of Local's
     Assets and Records
74.  Payment of Dues
75.  Local Assessments
76.  Delinquency of Dues Payment
77.  Sick Benefit Fund and Defense Fund Establishment
78.  General Fund Expenses

**Article XVII. Gender.**                                     17
79.  Gender

**Supplement A Principles.**                                  18
**Supplement B Practices.**                                   19
**Sick Benefit Fund**                                         21

## ARTICLE I

NAME
1.  The official name of the national organization is the Christian Labor Association of the United States of America.

## ARTICLE II

BASIS
2.  The Christian Labor Association bases its program and activities on the Christian principles of social justice taught in the Bible.

## ARTICLE III

AIM
3.  The aim of the Christian Labor Association is: to organize workers in trade and industrial union, for the purpose of propagating, establishing and maintaining justice in the sphere of labor and industry, and promoting the material and moral interests of the workers through the practical applications of Christian principles in collective bargaining and other means of mutual aid or protection.

## ARTICLE IV

PRINCIPLES
4.  Christian social principles are basic concepts for just relationships among men, which, largely through the influence of Christianity, have become accepted and predominant in Western civilization.  These principles are based on, or directly derived from, creation laws and social teachings set forth in both the Old and the New Testaments of the Bible, and are given expression in society through observance of such creation laws and adherence to ethical relationships and standards that reflect such social teachings.

In the field of labor these principles have bearing especially upon the dignity of human beings and their equality before God; their rights in regard to sharing in the benefits of creation resources and responsibilities toward each other and society. These principles are more fully defined in Supplement (A) of this Constitution.

## ARTICLE V

PRACTICES
5.  The Christian Labor Association actively engages in the taking of practical measures to apply Christian social principle in concrete situations in the labor field, and promotes such application by such means as are legitimate and in the best interests of the organization. Some of these activities are set forth in Supplement (B) of this Constitution and By-Laws.

1

# ARTICLE VI

MEMBERSHIP

6. All workers who have reached the legal age for taking employment, and who by signing a membership application card pledge to uphold the Constitution of the Christian Labor Association and the By-Laws of the affiliated local to which application is made, shall be accepted as members. Unless otherwise provided for by check-off, the appropriate initiation fee shall be paid at the time application is made. There shall be no discrimination because of religion, creed, race, color or national origin.

7. A member who moves into the territory of another local of the Christian Labor Association shall be given a transfer of membership from one local to the other. No member shall be given such a transfer; however, who has not met all his financial obligations or who is not in good standing in his present local.

8. A member who moves into a locality where no local of the Christian Labor Association is in existence may retain his membership by notifying the General Secretary of the National Board of his new address and by paying his membership dues to the National Board at least three months in advance.

9. Membership may terminate by resignation or expulsion. Resignations must be presented in writing.  The board of the local passes upon such resignations.  The board of the local shall also have the authority to suspend or expel any member. Suspension and/or Expulsion shall occur when any member carries on activities conflicting with the principles, aim, objectives, or practices of the Christian Labor Association including but not limited to:

   a.  Circulating or causing to circulate false or malicious information calling into question the reputation, character, or integrity of a fellow member, officer, representative or the union itself;

   b.  Initiating or promoting the secession from the union of members, or groups of members to become either non-union or join another union;

   c.  Taking out membership in the CLA or one of its affiliated locals for reasons of subverting or undermining the union or its' work;

   d.  Willfully violating the labor agreement and/or rules of the union;

   e.  Promoting, organizing or participating in an unauthorized job action;

   f.  Providing membership information or other internal union documents to a person or organization not authorized to receive such information.

2

Should a member engage in this action they shall be admonished by the board of his local, and if he fails to heed the warning shall be subject to suspension from membership privileges by the board and to final expulsion from membership in the Union. Expulsion shall occur only after said member has been provided written specific charges, given a reasonable time to prepare a defense and afforded a full and fair hearing at a regular local board meeting. An expelled member forfeits all claims to the exercise of the rights and privileges connected with membership in the Christian Labor Association but shall have the right to a final appeal at the next National Board meeting.

## ARTICLE VII

GOVERNMENT AND ADMINISTRATION

10. The highest authority in the CLA, subject only to the constitution, shall be the National Convention.  The National Convention is responsible for the CLA's overall activity in harmony with this constitution. The CLA shall meet in National convention biannually, and at other times in a special Convention upon the call of the National Board, or upon petition of at least twenty-five percent of the affiliated locals.

11. The National Convention shall be constituted of the convention delegates of the locals and the members and officers of the National Board. Each subordinate unit may be represented at each National convention by one official delegate selected by each subordinate unit.  Two or more units may jointly send one delegate, and such delegate shall cast all the votes allotted to the units he represents.

12. National Board members shall have one vote each on all matters coming before the convention.  Delegates shall have voting power on all matters, except financial matters, weighted according to the number of members in good standing in the unit(s) they represent, as shown in the records of the National Treasurer on January 1 of the year in which the convention is held.  On financial matters both the National Board members and delegates have one vote each.  Officers shall not have a vote in the election of officers.

3

13. Each unit shall have at least one vote up to and including 50 members and extra votes on the basis of one vote for each additional 50 members or fraction thereof, except on financial matters as provided for in paragraph 13 above. Delegates shall be free to vote on matters brought before the convention as they consider to be right, unless the units they represent have instructed them to vote on any matter in a certain way by decision taken at a meeting of the unit.

14. Any member of the Christian Labor Association in good standing may attend conventions as a visitor, and the privilege of the floor may be extended to members other than National Board members and delegates at the discretion of the President.

15. The National Board shall be in charge of all arrangements for convention. It shall set the time and place, invite speakers and guests, set up the agenda, and make all other arrangements. It shall send to all affiliated units, at least sixty (60) days in advance, the official call to the convention, enclosing therewith all proposals which shall be considered, the list of offices to be filled by the convention and nominations therefore; and such other information as will aid the units and their delegates in preparing for the convention.

16. Any member of the CLA may submit proposals for convention consideration. He shall first submit the proposal to the board of his local, which shall report the proposal to the local's membership with a recommendation. If the local's membership endorses the proposal it shall forward it to the National Board at least four (4) months prior to the date of the convention where it is to be considered. The National Board shall report the proposal to all affiliated Christian Labor Association units along with the convention call, and shall place the proposal on the agenda for the convention. It shall make a recommendation on each such proposal to the convention. The National Board may initiate proposals for the convention at any time provided they abide by the sixty (60) day advance notice to affiliated units as specified in paragraph 16.

## ARTICLE VIII

NATIONAL BOARD

17. The National Board shall consist of five elected officers of the CLA: Chairperson, President, Secretary, Treasurer, and the Assistant Secretary-Treasurer, plus one National Board member designated from each affiliated local. An additional National Board member shall be added from each local having 200 or more members. The National Board's voting members shall be comprised of active union members who are not paid staff of the CLA or its locals.

4

17(a). The Chairperson shall preside at all meetings of the National Board, and shall appoint members to serve on committees authorized by those bodies and shall be a member ex-officio of all of them.  The Chairperson assures the integrity of the National Board's process and, secondarily, represents the Board to outside parties.

18. The National Board shall be responsible for the overall governance and direction of the National organization.  The National Board governs as one voice to the union. In return, union staff speaks to the board as a body through a single voice, that being the President.  The National Board shall exercise executive powers in administering all matters relating to the common interest and welfare of the CLA. It shall carry out decisions of conventions by its own action and authorizations to the National Board of Directors. It shall engage National Representatives and such other employees as may be necessary for the proper functioning of the organization, and fix salaries and other terms and conditions of employment of National Representatives.

19. The National Board shall have power to issue Charters to affiliated units, to suspend or revoke them, and to fix the jurisdiction of such units; it shall give guidance to subordinate units and approve, modify, or reverse actions of the National Board of Directors, and exercise such other powers as may be granted to it by the constitution or convention action.

20. National Board members shall be elected by their qualifying units.  Terms of office shall be for two years commencing on June 1.  Retiring National Board members may be re-elected.  The names of National Board members elected shall be certified to the National Secretary by the units.

21. The National Board shall meet at least once per year and may meet at other times upon call of the National Board of Directors.  A National Board meeting shall be held not less than three months or more than six months prior to the Convention in years when a National Convention is held. Meetings will be held at the Christian Labor Association headquarters unless otherwise decided at a previous meeting. The agenda for National Board meetings shall be prepared by the President in consultation with the Chairperson of the National Board, and sent to all National Board members not less than ten days before any meeting is to be held.

22. In emergencies arising between regular meetings of the National Board, the National Board of Directors may call a special meeting of the National Board or it may take a poll of the members of the National Board on any issue, by mail or telephone.  Any person or unit aggrieved by a decision arrived at by a poll shall have the right to a hearing before the next National Board meeting where the poll may be affirmed, modified, or rescinded.  The request for such a hearing must be filed with Christian Labor Association headquarters within ten days after the poll decision was made known to the affected person or unit.

23. Voting power of all members of the National Board shall be equal. A majority vote of those present shall rule on all questions. A quorum shall consist of a majority of the members.

24. National Board members shall be paid a stipend of $100 for attendance of National Board meetings for their office and shall be reimbursed for wages and benefits lost from their regular occupations and for incurred expenses. Yearly officer pay shall be as follows:
    $2400 President
    $1200 Chairperson
    $1200 Secretary
    $1200 Treasurer
    $900  Vice-President
    $600  Assistant Secretary / Treasurer (Only if filling in for Secretary or Treasurer)

## ARTICLE IX

NATIONAL BOARD OF DIRECTORS

25. The National Board of Directors shall consist of the President, Vice-President and National Representatives, in cooperation with the Secretary and Treasurer.

26. The National Board of Directors shall be responsible for the day-to-day operation of the National organization and shall report to and be held accountable by the National Board. The National Board of Directors shall administer, conduct and direct the daily business of the CLA, which shall include but is not limited to:

    a. the propagation of the Christian Labor Association cause;
    b. the formation of new Christian Labor Association units;
    c. keeping oversight of the units and giving them leadership and aid;
    d. the promotion of CLA interests before governmental agencies and legislative bodies;
    e. appearances before public forums;
    f. defense of the Christian Labor Association by legal means;
    g. fix salaries and other terms of conditions of employment for employees other than national representatives;
    h. and such other activities as are deemed to be in the interest of the CLA.

    In the performance of these duties the National Board of Directors may make assignments to its members and to other qualified Christian Labor Association members and employees of the CLA or other professional help.

    The National Board of Directors shall, after conducting a hearing, also have the power to discipline an employee or to suspend him from office until the next meeting of the National Board, at which time the disciplinary action or suspension shall be reviewed and the affected party shall be given every opportunity to be

6

heard and to make his defense, after which the National Board shall make its decision to sustain, modify, or reverse the action of the National Board of Directors.  Should the action of the National Board of Directors be reversed, the employee shall be entitled to full pay for the period of suspension.

27.   The National Board of Directors shall meet as often as the proper administration of the affairs of the CLA requires, or at call of the President.  A resume of minutes of National Board of Directors meetings shall be given at meetings of the National Board.

28.   The President shall preside at all meetings of the National Board of Directors and at all conventions and shall appoint members to serve on committees authorized by those bodies and shall be a member ex-officio of all of them.  The President shall serve as executive liaison between the National Board of Directors and the National Board.

29.   The Secretary, or their designee, shall keep minutes of all National Board of Directors and National Board meetings and conventions and shall send copies of the minutes of all National Board meetings and conventions to all members of the Board.

The Secretary, or their designee, shall keep a record of all the affiliated local units and their officers, and keep an up-to-date list of the members of the local units in cooperation with the officers of such units.

The Secretary, or their designee, shall present a written report on the status of the CLA at each biannual convention.  He shall, in consultation with the President, prepare the agenda for all meetings of the National Board and the National Board of Directors.

30.   The Treasurer, or their designee, shall be responsible for keeping an accurate account of all receipts and disbursements of CLA funds.

The Treasurer, or their designee, shall be responsible to: serve on the Salary Committee; make deposit of all receipts in a bank approved by the National Board of Directors; make all disbursements by check; remind delinquent local treasurers of their obligations and report those three months in arrears to the National Board of Directors.

The Treasurer, or their designee, shall incur only those expenses authorized by the National Board of Directors or the National Board or National convention.  The Treasurer, or their designee, shall make monthly reports to the National Board and an annual report to the National Board.

31.   The Vice President shall assume all the duties of the President in case of the President's inability to be present at a meeting or his inability temporarily to fulfill the duties of this office, and shall assume the duties until a successor is chosen by the National Board should the President be removed from office for any lawful reason.

7

32.  The Assistant Secretary-Treasurer shall assume the duties of either the Secretary or Treasurer in case of inability of either to be present at a meeting, or inability of either temporarily to fulfill the duties of their office, and shall assume such duties until a successor is chosen should either be removed from office for any lawful reason.

33.  National officers shall be elected at the National Convention by the National Board Members and Convention delegates for four-year terms. The terms of the President, the Treasurer, and the Assistant Secretary-Treasurer shall expire on May 31, 2018 and every four years thereafter; the terms of the Chairperson**,** the Secretary, and the Vice-President shall expire on May 31, 2020 and every four years thereafter.

    (b) The National Board will provide local units with the opportunity to submit nominations for national officers to the National Board. These nominations must be submitted at the National Board meeting prior to the call to the convention. The National Board shall present these and other qualified nominations in the call to the convention.

    (c) Each of the National Officers shall have the right to attend and speak at any meeting of any subordinate body, unit, or committee of the Christian Labor Association.

    (d) National Board of Directors members, except those who are full time employees of the Christian Labor Association, shall receive payment for time lost from their work at their hourly rate of pay. For any additional time spent in Christian Labor Association service other than working time lost, and exclusive of time spent at National Board meetings, they shall receive payment set by the National Board from time to time.

**ARTICLE X**

SUBORDINATE UNITS
34.  The Christian Labor Association is a national labor organization.  Its chartered locals and councils are subordinate in authority to the Christian Labor Association, as expressed in this constitution or by the convention or by the National Board.

35.  Subordinate units shall not have a separate constitution but shall operate under this constitution.  They may, however, adopt such additional rules and regulations or by-laws as  are  necessary  for the proper  conduct of  the units and

8

the participation of the membership in their affairs. The National Board of Directors shall advise in preparing these rules, and in no case shall rules go into effect unless endorsed by the National Board of Directors.

36. All charters of affiliation with the Christian Labor Association shall be issued by the National Board, which shall also determine the jurisdiction of each unit, and shall have discretion concerning the number of members necessary to establish a new unit.

37. In the event the National Board of Directors has reasons to believe a local is failing to comply with any provision of this Constitution or any lawful directive of the Christian Labor Association, the President in consultation with the Chairperson shall appoint a committee of National Board members to investigate and report to the National Board.

   The National Board of Directors shall cause such investigation and report to be made whenever it is charged in writing by any National Board member or Representative or other employee of the National Board, or by a substantial number of members of the local (which shall in no case be less than 20%) that any of the following needs correction: 1) corruption or financial malpractice; 2) performance of collective bargaining functions; 3) failing to process grievances properly; 4) violation of democratic procedures; 5) not carrying out other vital and legitimate purposes of the Christian Labor Association or the local. The local shall be notified of the date and place of the investigation committee hearing, and any officers or members shall have the right to appear and testify for or against the local at the hearing. The National Board shall render a decision, dismissing the proceedings, suspending or revoking the charter of the local, suspending an officer or officers of the local, or such other action as may be necessary to secure compliance with the Constitution. Any party aggrieved by action of the National Board shall have the right to appeal to the next convention, which may concur in, rescind, or modify the decision of the National Board.

38. CREATION OF LOCALS
   Whenever, in the discretion of the National Board, there are enough members in a locality in a specific trade or industry or related occupation to make a local feasible, the National Board shall encourage such members to form a local. The members must apply for a charter (with the assistance of any Christian Labor Association officer or employee), and must elect officers at an organizational meeting.

39. A Local Board is responsible for the supervision of all the activities of the Local

and its constituent bargaining units, is charged with the duty of implementing and enforcing this Constitution as it affects their members, and is responsible for complying with the decisions of the National Convention and the National Board.

40. LOCAL OFFICERS
The officers of a local shall be: The President, Secretary, Treasurer and General Assistant, who shall constitute the board of the unit. The unit may also elect a limited number of trustees who shall meet with the board in an advisory capacity. A Local Board shall be deemed to have authorized any CLA representative to act as agents of the Local in conducting day-to-day affairs of the Local including the entering into and the administration of labor agreements on behalf of the Local and its members.

41. Except under special circumstances approved by the National Board, officers shall be elected for two-year terms; the terms of the President and General Assistant shall expire on April 30 in even numbered calendar years, and the terms of the Secretary and Treasurer on April 30 of the uneven numbered calendar years.

Elections will be held each year to fill Board vacancies. Board Members shall be declared elected if they receive a majority of the votes cast by eligible members of the Local. The Local Board may conduct elections by mail ballot if geographic distances or other circumstances are likely to prevent members from attending a meeting at which elections are to be held.

42. DUTIES OF OFFICERS
1. The President of a local shall preside at all its meetings and perform such other duties as are commonly held to pertain to the office.

2. The Secretary of a local shall keep the minutes of each meeting, carry on the official correspondence, keep a complete list of the names and addresses of the membership, send notices of meetings and perform such other duties as pertain to his office.

3. The Treasurer of a local shall collect the membership dues and keep record of such payments, report members in arrears to the local board, and turn over to the National Treasurer once each month an amount equal to the dues collected for the CLA as set forth in Article XIV of this constitution. He shall also keep an accurate account of the finances disbursed for local purposes and

10

render a monthly report to the National Treasurer and an annual report to the local as a whole, a copy of which shall be sent to the National Treasurer not later than the 15th of February of each year.

4. It shall be the duty of the General Assistant to substitute for any absent officer at any meeting, and to fill a vacancy in any office until a successor has been chosen.

43.   MEETINGS - LOCALS
Local organizations shall hold meetings as often as the needs of the local may require.  Only such business shall be transacted as is properly brought before it and is within the scope of the activity of the local, among which shall be the discussion of labor problems and their solution, the formulation and adoption of labor agreements, action on proposals and reports of bargaining committees and action on the policing of labor agreements. No proposal concerning any change in activity or policy or disciplinary action shall be taken up at any meeting if it has not been submitted to the board of the local at least two weeks before the regularly scheduled meeting of the organization at which it is to be submitted.

44.   DISTRICT COUNCILS
Locals which are close enough to make joint action feasible may form a district council for the purpose of propagating the Christian Labor Association in the area by promoting and strengthening existing units and assisting in establishing new ones, by giving aid and encouragement to each other, by helping to protect members against encroachment upon their occupations, and by rendering advice and assistance in settling disputes within existing units or between locals and their employers.   District councils shall not have authority over locals or their members.

45.   District Councils shall be composed of the President and Secretary of each local in the area, except that if a President or Secretary is unable to serve, the local may elect another delegate.

46.   The council shall elect from among its members a President, Secretary and Vice President, who together with one of the Christian Labor Association Representatives appointed by the National President, shall constitute the board of the council.  The Board shall guide the affairs of the council and shall cause to be executed the decisions of the council.  The President shall preside at meetings, the Secretary shall record the minutes and issue all official correspondence, and the Vice President shall substitute for either in their absence.

11

47.  The council shall meet upon the call of the President whenever aid is sought by one of the locals or the area business representative.

48.  Expenses incurred by councils shall be paid by the National Treasurer, provided such expenses were approved in advance by the National Board or National Board of Directors. All incoming money to the council shall be remitted to the National Treasurer.

## ARTICLE XI

ELECTIONS – ALL CHRISTIAN LABOR ASSOCIATION UNITS

49.  A secret ballot shall be used every time an election is held for an elected position of the CLA or its subordinate units.

50.  Nominations for candidates may originate with any member, but all nominations must be endorsed by the appropriate board, only in order to assure that the person nominated qualifies under the provisions of the Federal or State labor laws and the minimum qualifications following.  The National Board shall endorse candidates for national offices and local boards for their own offices and delegates.

    1)  To be nominated for any national office the person must have been a member of a Christian Labor Association local unit for at least a year.  To be nominated for a local office, delegate or trustee, except in a new unit, the person must have been a member of the unit which elects him for at least six months.

    2.)  To be nominated for any national office the person must have maintained continuous good standing based on the punctual payment of dues the last 6 months.

51.  The Secretary of each board responsible for endorsing nominations shall announce to the membership of their unit the offices to be filled and the time and place where the board will consider nominations, in order to give members a reasonable opportunity to present candidates of their choice.  It is not necessary for a member to attend a nomination meeting to nominate or be nominated.

52. (a) The complete slate of nominees for national offices who will be elected at a convention shall be included in the official call to the convention.
    (b) Local units shall mail to each member, the complete slate of nominees at least 15 days prior to the date of the election.

53. Ballots shall be opened and read aloud at the meeting where the election takes place, or, in case of a very large number of ballots or in the case of a mail ballot election, the chairman may appoint a committee to count the ballots and report the results to the membership. Any candidate shall have the right to check the count for accuracy, or have as many observers as necessary at any facet of the election.

54. A candidate shall be declared elected if he received a majority of one-half plus one of the votes cast. In case no candidate receives a majority on the first ballot, or subsequent ballots, the candidate with the lowest number of votes shall be dropped from subsequent ballots, and voting shall continue until one candidate receives a majority. In case of a tie vote repeated on two ballots the winner shall be chosen by casting lots.

55. Election of the six national officers shall be conducted at each biannual convention. Nominations shall be considered and made at the National Board meeting prior to the convention.

56. Election of National Board members shall be conducted by the locals at the annual meeting or by mail ballot prior to the expiration of the current terms.

57. If any officer or board member of the CLA or a local unit dies, becomes disqualified to serve, or is absent from three consecutive meetings without valid excuse, the other officers of the body in which he served, or which elected him in the cases of an National Board member, shall appoint a member to fill out the term.

58. An officer's term shall not expire and the officer shall remain in office until his successor is chosen and installed.

59. No officer shall retain any property or records of the CLA or its local units, but shall turn over all such property to his successor within 30 days after his term expires or his successor is installed.

60.   Any officer may be impeached and removed from office for conduct, which reflects unfavorably upon the CLA, or for misconduct of his office, or for neglect in the performance of his duties.   Trial of an officer of the CLA shall be conducted by the National Board, which shall also render a judgment in these cases.   Trial of an officer of a local unit shall be conducted by the board of the unit, but the judgment in these cases shall be rendered by the regular members in attendance at the trial.   The board having jurisdiction shall grant the impeached person a full and fair hearing.   Judgments shall not extend further than removal from office, except that a convicted party shall nevertheless be liable for prosecution under civil laws.   Appeal of a judgment may be taken to the next convention.

## ARTICLE XII

REPRESENTATIVES

61.   National Representatives.   All National Representatives hired by the National Board shall be under the day to day supervision of the National Board of Directors,   except, that the National Representatives shall have the right to appeal any reprimand or suspension to the National Board.   National Representatives shall be issued credentials by the National Board of Directors, signed by the National President.   They shall be required to report on their activities at any meetings upon the request of the National Board of Directors.   They shall attend general meetings and board or committee meetings in the locals assigned to them.

62.   Local Representatives.   Local unions may, with permission from the National Board, hire their own Local Representatives, who shall be under the supervision of the board of the local.   Such locals shall consult with the National Board of Directors as to assignments to prevent duplication of assignments, and they shall make their representatives available for service to other Christian Labor Association units in cooperation with the National Board of Directors.   In such cases the National Board may make special financial arrangements with the local to increase the amount of the initiation fees and dues retained by the local, for payment of a Local Representatives.

63.   National and Local Representatives shall give aid to any of the officers in the conduct of their official duties and shall specifically be engaged in contacting prospective members, securing employment for members, negotiation of contracts, aiding in settlement of grievances against employers, carrying on propaganda for the Christian Labor Association and their locals, and such other promotional activities as they are directed to do by the board in charge.

## ARTICLE XIII

STRIKES

64.  A bargaining unit may vote to take legal strike action against its employer. However, the National Board shall be the sole agency on behalf of the CLA and its affiliated locals to sanction strike action. No strike action shall be undertaken by any bargaining unit without the prior approval of the National Board, and not without full compliance with the local's by-laws and this constitution, particularly paragraphs 11 and 12 of Supplement (A) of this constitution.

## ARTICLE XIV

ORDER OF BUSINESS

65.  Except that the agenda of every meeting of all local units, councils, National Board and National Board of Directors meetings and the biannual and any special convention shall provide for opening and closing with prayer, the President and Secretary in consultation with the Chairperson shall in each case make up the agenda setting forth the business to be taken up at each meeting.

## ARTICLE XV

AMENDMENTS

66.  Amendments to this constitution shall be handled in the same manner as set forth in paragraph 17, except that amendments must receive two-thirds of the votes at a convention for adoption.

## ARTICLE XVI

FINANCES

67.  The fiscal year of the CLA and its local units shall run from January 1 to December 31.

68.  The President, or in his absence the Vice-President, the Secretary, the Treasurer, or the Assistant Secretary-Treasurer of the CLA (a Michigan Corporation) are authorized to sign all deeds of conveyance, mortgages, notes, and other legal instruments, upon decision by the CLA or its National Board, acting as directors of the corporation, to take such action.

69.  The annual audit of the Treasurer's books of local units shall be made each January by an auditor or auditing committee selected by the board of the unit. A copy of the Treasurer's annual report and the auditor's statement shall be made available to each member of the unit and a copy shall be sent to the CLA.

70.  The annual audit of the National Treasurer's books shall be made in January by a certified public accountant selected by the National Board.  A copy of the Treasurer's annual report and the auditor's statement shall be reviewed at the next National Board Meeting or at the next National Convention. A copy of the annual report shall be made available to each member of the Association.  The original auditor's report shall be filed with the National Secretary.

71.  Initiation fees for new members of a local union shall be at least $30.00.  The fee may be increased, but not higher than $500.00, provided the members of the unit approve the increase.  Initiation fees may be waived during an organizing drive or for other good purpose by decision of the National Board.  Payment of the initiation fee and one month's dues in advance entitles a member to all the privileges of membership as stated in the constitution.  Each new member shall receive a copy of the constitution and by-laws of the Christian Labor Association of the United States of America.  Eighty-five percent (85%) of initiation fees received by a unit shall be remitted to the National Treasurer, unless other arrangements are made with the National Board in accordance with paragraph 63 above.

72.  Eighty-two percent (82%) of dues received by a local unit shall be remitted to the CLA-USA National Treasurer, unless other arrangements are made with the National Board in accordance with paragraph 63 above.

     If a member works 80 hours or less per month, on a regular basis, he shall pay 50% of the regular monthly dues.  If a member works 120 hours or less per month, on a regular basis, he shall pay 75% of the regular monthly dues.  If a member works more than 120 hours per month, he shall pay the regular rate of membership dues.

     Every January 1st union dues shall be increased by the amount of the Consumers Price Index, United States City Average as determined by the prior 12 month average ending in August and available in the September publication, rounded up to the nearest twenty five cents ($0.25).  The National Board reserves the right to reduce or suspend the amount of a scheduled union dues increase for any reason the Board deems as necessary.

     Dues for members in non-construction signatories will be two hours pay rounded up to the next $1.00 to a maximum of the current non-construction dues rate.

73.  In the event a local unit is disbanded or its charter is revoked, all its assets and records shall become the property of the CLA until such time as the unit is reorganized or its charter is restored.

74.  Local units shall provide opportunity for members to pay dues at stated times and places, or by appointing an agent or collector.

75.  Local units may levy assessments in addition to the dues, to be used for local purposes, provided such levy is first approved by the members of the local by secret ballot and second approved by the National Board.

76.  Local units shall make provision in their By-Laws covering the proper collections of the monthly dues and the period of time during which a member who is delinquent in the payment of dues shall be kept on the membership rolls. Provided that: a local unit may excuse an unemployed or disabled member from paying dues for a limited period of time, but shall nevertheless pay to the National Treasurer from the local treasury an amount equal to 82% of the local's regular dues in order for such a member to be in good standing in  the Christian Labor Association  nationally.

77.  Of the regular membership dues remitted by local units to the CLA, thirty-five cents per member shall be placed in the Christian Labor Association Sick Benefit Fund.  Any local of the Christian Labor Association may, after consultation with the National Board, elect not to have its members share in the benefits of the Fund, but to retain the thirty-five cents per members monthly for local union purposes.  Forty cents per member per month shall be placed in the Christian Labor Association Defense Fund.  All of the balance received as the CLA's share of membership dues, all of the CLA's share of the initiation fees, and all miscellaneous income shall be placed in the General Fund.

78.  The General Fund may be expended under the direction of the National Board or the National Board of Directors for any purpose aiding the good and welfare of the CLA.

**ARTICLE XVII**

GENDER.

79.  Any reference to gender within this document includes both male and female.

**SUPPLEMENT (A)**
**Principles**

Principles to which the Christian Labor Association is committed are these:

1.   All human beings bear the image of their Creator and must as such be treated with dignity, respect, and love.  Every violation of the divinely given law of love among men is a sin against God.

2.   Discrimination in employment because of color, creed, race, or national origin conflicts with the Biblical principle of the equality of all human beings before God and the law of love toward all men.

3.   The task of developing the resources of the world has been entrusted to the human race as a whole, which implies that there must be opportunities for participation in the fulfillment of that task for all members of society.

4.   It has been so ordered that men shall live by the fruit of their labors and that in the performance of their work they shall make use of and develop the physical and intellectual qualities with which they have been endowed; hence all men are entitled to such a regard upon their labors as will be adequate to meet their family needs and social obligations in a respectable and honorable manner, and which will reflect also the measure of their devotion to their respective tasks.

5.   Creational resources may not be exploited for personal gain or the enrichment of a group, or a community, or a nation, but must be developed for use in the service of all mankind.

6.   Injustices in relations among men are due, basically, to violations of divinely Instituted law and order.  Removal of injustices may not be sought by means of promotion of class conflict or by revolution against properly established authority, which actions are in themselves contrary to divine law, but must be promoted through reformative measurers that are in harmony with divinely instituted law and order.

7.   The interdependence of employers and employees, their many common interests, their obligations and responsibilities toward each other, their mutual obligations and responsibilities toward society in general, given fulfillment in obedience to the law of love, demand that there be co-operation between them in the promotion of the best interests and welfare of all concerned.

18

8.    Employers and workers and their organizations must constantly strive for the attainment and maintenance of labor conditions in which the spiritual and the physical and moral well being of the workers are advanced; which demands conditions in which interest in the work being done and joy in the performance of it are stimulated.

9.    The common bonds of interest between workers demand that there be organization among them for the purposes of protection of inherent and lawfully established rights and the promotion of their mutual welfare, through collective bargaining and the negotiation of labor agreements.

10.   Workers who share in the benefits gained through the activity of an organization that represents them are socially and morally obligated to assume a just share of the obligations that are attendant upon such organized activity; provided, however, that no organization should have the right to demand the discharge of a worker who because of a conscientious conviction cannot join the organization nor contribute financially to it.

11.   When labor disputes arise both employers and workers must use every available means to settle their differences by means of conferences, mediation, or arbitration.  The use of violence against persons or property, the unlawful seizure of property, the employment of labor spies, intimidation, coercion, discrimination, and all other unchristian methods for either advancing or discouraging organization, or forcing the settlement of a dispute, stand condemned.

12.   All workers, whether acting individually or collectively, have the inherent right to refuse to continue to work  under an unjust condition, after  having exhausted every reasonable means to remove the injustice by means of conference, mediation or arbitration; except that in any industry or institution or public service, where a cessation of work might endanger the life and health of people, or might directly imperil the welfare of the community or nation, the right to refuse to continue to work must be surrendered and all disputes settled by means of neutral arbitration.

**SUPPLEMENT (B)**
**Practices**

Among practical measures which the Christian Labor Association will take to reach its objectives are these:

(1)  Encourage its members to render the highest grade of workmanship and service in the trades or occupations in which they are engaged, and promote co-operation between workers and their employers on the basis of justice, love, and mutual interests.

(2)  By organized activity negotiate and maintain labor contracts that will guarantee to workers adequate wages and other just labor conditions in keeping with the Christian social principles set forth in this constitution.

(3)  Maintain Sunday as a day of rest and oppose all Sunday labor except that which is necessary because of natural laws and the protection of health and the public welfare; provided that the Christian Labor Association  shall also protect the right of people who because of religious convictions hold their Sabbath on another day of the week, to do so and not suffer any discrimination as a result.

(4)  Encourage its members to study and discuss current economic and social conditions and the bearing of Christian principles upon them.

(5)  Carry on propaganda through the written and spoken word for Christian economic and social principles, and for the taking of measurers which will improve labor conditions and relationships and will counteract the unwholesome influence of labor groups that are inspired by communistic or other unchristian principles.

(6)  Bring influence to bear upon the government of municipalities, state, or nation whenever important interests of labor and industry are at stake in legislative assemblies, and exert legitimate influence upon administrative bodies or agencies.

(7)  Take practical measures to avoid labor disputes, and if such disputes do arise, champion methods for peaceful settlement.

(8)  Co-operate with organizations pursuing similar objectives whenever such action is deemed advisable and does not conflict with the Christian principles to which the Christian Labor Association is committed.

(9)  Assist its members in securing employment and, through such practical measurers as are feasible; relieve as much as possible financial pressure upon its members when it is caused  by involuntary unemployment, disability, or old age.

(10)  Such activities that are in accord with Christian Labor Association  principles and objectives as may be decided upon by the organization from time to time.

**RULES AND REGULATIONS OF**
**CHRISTIAN LABOR ASSOCIATION SICK BENEFIT FUND**

1.   The Christian Labor Association Sick Benefit Fund is established by setting aside thirty-five (35) cents per month per active member of the Christian Labor Association from the amount of the membership dues received by the National Treasurer of the Christian Labor Association from the affiliated locals.

Any local of the Christian Labor Association may, after consultation with the National Board, elect not to have its members share in the benefits of the Fund, but to retain the thirty-five cents per member monthly for local union purposes.

2.   The National Treasurer of the Christian Labor Association shall be in charge of the monies of the fund and shall deposit all such funds in a bank approved by the National Board and shall keep a separate record on his books of the receipts and disbursements of the fund.  Reports on the standing of the fund shall be made by the National Treasurer of the Christian Labor Association at all such times as he is required to render a report on the finances of the Christian Labor Association.

The auditing of the records of the fund shall be done in the same manner as provided for in the Christian Labor Association Constitution and By-Laws in regard to the books of the National Treasurer.

3.   The maximum amount of aid to be granted to a sick member from the fund shall be determined each year at the biannual convention of the Christian Labor Association upon the recommendation of the National Board of the Christian Labor Association.

Only those members of the Christian Labor Association paying the minimum amount or more monthly in dues shall be eligible to receive the maximum allowable amount in a twenty four month period; those paying less than the minimum amount shall be eligible for only 50% of such maximum amount.

4.   The maximum amount of sick benefit may be paid, in accordance with the rules governing such payments, in a 24-month period, commencing with the date on which the member was first unable to work because of sickness or accident.

5.  Sick benefits shall not be paid to anyone whose membership dues in his local are not paid up to date, except that any member whose dues have not been paid during a period of not more than six months preceding the date on which he applies for sick benefits shall be given an opportunity to pay the dues up to date previous to filing his claim.  The application of allowable benefits toward the payment of unpaid dues shall be allowed if the member is not able to pay unpaid dues in any other way.  The secretary of a local shall not submit any claim for sick benefits until he has verified that the applicant's dues are paid up or provision for payment has been made through the application of allowable benefits.

6.  In case of inability to work because of sickness or accident the member must so report to the secretary of his local.  The members shall keep the secretary informed and, within one week after his return to work or not later than forty-five days after the member was unable to work (whichever is earlier), the secretary shall send in the report on the case to Christian Labor Association headquarters on a form supplied by the National Board of the Christian Labor Association for that purpose, accompanied by a statement from the claimant's physician, or the plant company nurse, attesting to the sickness and its duration.

7.  Sick benefit allowances shall commence on the eighth day after the member was unable to work, and the total amount allowable for the thirty days following, or fraction thereof, shall be paid to the claimant within ten days after the final report on the case has been received at Christian Labor Association headquarters, provided the rules governing the payment of benefits have been adhered to.

Any Christian Labor Association member who has been a member of his local union at least one full year, shall be entitled to the full amount allowable, as decided upon by the Christian Labor Association Convention, if the inability to work due to sickness or accident extends over a period of not less than thirty consecutive days commencing with the eighth day of the disability, or to a lesser amount proportionate to the number of days of such disability.

9.  No payments from the fund shall be made to any member whose sickness or inability to work is due to unchristian conduct, or a result thereof.  Nor shall any payments be made to any member whose illness does not prevent him from performing his or her work, or whose inability to work is due to maternal confinement.

Any member who has received payments from the fund during three consecutive twenty four month periods for inability to work due to a recurring chronic illness, shall not be entitled to further payments from the fund for inability to work due to the same chronic condition.

10. Any member who is refused financial aid from the fund by the National Board of Directors shall have the right to appeal to the National Board of the Christian Labor Association through the secretary of the local of which he is a member.

11. These rules and regulations shall be effective on and after June 1, 2002, and any rules and regulations previously made governing the Christian Labor Association Sick Benefit Fund which conflict with these rules and regulations as given above, are thereby rendered ineffective.

23

# Exhibit B



# Christian Labor Association

### of the

## United States of America

## CHARTER OF AFFILIATION

The Christian Labor Association of the United States of America, an independent national labor organization, established for the purpose of promoting and maintaining just labor conditions and peaceful relationships in the areas of Labor and Industry, on the basis of Christian social principles, and constituted of Local Unions in various places in this nation, upon conditions hereinafter stated, issues to the Local Union known as

Dairy Employees Union, Local #17, Christian Labor Association, USA

*Officers:*

Bernard Vander Weide
*President*

Ben Meninga
*Secretary*

Ben Meninga
*Treasurer*

and their successors,

## THIS CHARTER

of affiliation for the establishment and maintenance of said Local Union among the employees of

Employers in the Milk Producers and Processors Industry in Southern California

The conditions upon which this Charter and its attendant privileges and benefits of affiliation are granted are these:

1. That said Local Union shall be subordinate to and comply with all the provisions of the Constitution of the Association which issues this Charter.
2. That said Local Union shall be bound by the decisions of the Conventions of the Association, and by decisions of its National Board.
3. That said Local Union shall in all its activities be directed by the Christian principles set forth in the Constitution of the Association, and shall exercise due care that its conduct cast no detrimental reflection upon the Association.
4. That, if said Local Union, or its Board, should violate the conditions upon which this Charter is issued, the National Board of the Association shall have the right to take such action as it may deem necessary to restore conformity or, if that should be impossible, to revoke this Charter, thereby annulling affiliation with the Association.
5. That, if this Charter should be revoked, or the Union should for any reason disband, all the assets and properties of the said Local Union shall become the property of the Association.

IN WITNESS WHEREOF we have hereto set our hands and attached the Seal of the Christian Labor Association, U.S.A., this __27th__ day of __December__, 19 65.

NATIONAL BOARD CHRISTIAN LABOR ASSOCIATION, U.S.A.

Harry A. Vander Laan
*President*

John W. Kamstra
*Secretary*

# Exhibit C

# DAMON, VER MERRIS, BOYKO & WITTE, PLC

ATTORNEYS AT LAW

CURTIS R. WITTE
EMAIL crw@dvbwlaw.com

TELEPHONE (616) 975-9951
FACSIMILE (616) 975-9973

825 PARCHMENT DRIVE SE, SUITE 100
GRAND RAPIDS, MICHIGAN 49546-2382

November 17, 2020

Ms. Joni Tulenchik
(218) 454-5019

**Sent Via Facsimile, Only**

Re:    Christian Labor Association

Dear Ms. Tulenchik:

The attached is a Position Paper that we have been asked to present on behalf of Locals 10, 12, 17, 18 and 25.

We anticipate addressing this today in your planned meeting.

Very truly yours,

DAMON, VER MERRIS, BOYKO & WITTE, PLC

By
      Curtis R. Witte

CRW/vkr
Attachment
U:\CRW\CHRISTIAN LABOR ASSOCIATION 6170\037 DISAFFILIATION\COR\Tulenchik111620.doc

## INTRODUCTION

The Michigan and California local boards recently held a joint meeting to review a number of issues concerning national board governance in recent months. Relations between the Minnesota region and the California/Michigan regions have become strained. Tensions between the regions are not a new or uncommon phenomenon. Repetitive issues have existed and cycled over many years. The main difference between then and now, however, is the Minnesota Board members' apparent abandonment of operational and constitutional governance. Our concerns include the following:

## FAILURE TO CONDUCT REQUIRED MEETINGS

1. Specific to the recent year, the national president has failed to hold meetings with the national board of directors. The national board of directors (staff), as defined by Article IX of Constitution, "shall be responsible for the day-to-day operation of the national organization…" In contrast, the national board (non-staff), as noted in Article VIII, "shall be responsible for overall governance and direction of the national organization." This separation of board duties between oversight and operations was particularly underscored during CLA strategic planning held in Las Vegas, where the intent was to create greater clarity of duties and functions for national board and national board of directors. The failure to hold national board of directors' meetings was brought to the full national board's attention during meeting held on November 6, 2019. During that meeting the national board agreed that the national board of directors should meet regularly, and the minutes reflect "should be every 2-3 months…" The national board of directors last met in February 2020. In addition, the national president has rarely consulted with the National Treasurer regarding budgetary matters. This failure has resulted in the national board of directors being rendered unable to fulfill its role and responsibility for operational functions, as is outlined in the Constitution.

## "ALTERNATES"

2. The Minnesota board members have engaged in a process of adding additional national board members though the use of "alternates." The Minnesota boards have decided that alternate board members have the full authority and voting power of regular board members – even when regular board member(s) are present, it seems. The behavior of the Minnesota board is outside the parameters of the constitution of the national organization. The Constitution and bylaws do not include a provision for alternates, and the Minnesota board members never brought the matter to the national board or national convention as a proposal for consideration. They simply acted unilaterally, without approval of the national board.

1

## MINNESOTA LEADERSHIP ACTING INDEPENDENTLY OF NBD, PURPORTEDLY ACTING AS THE FULL NBD, IN VIOLATION OF THE CONSTITUTION

3. A.  The Minnesota boards with the national president decided to write and approve an Operations Manual for the national organization, devoid of any input or consultation with the national board of directors (NBD), the very body charged with oversight of operations.

B.  Minnesota members of the National Board have increasingly engaged in pre and post discussion meetings surrounding official national board meetings, and have come to conclusions on matters before there is discussion involving the full board.  One recent example involved a post-board meeting discussion that focused on Mr. Ace Marquez in which the decision to issue Mr. Marquez a reprimand occurred after the national board meeting had concluded. This decision did not include a roll call or vote, and ignored comments from members outside of Minnesota requesting further discussion. Interestingly, at least two Minnesota board members e-mailed a response stating Mr. Marquez should not be reprimanded if there was a valid reason for the absence.  Yet, the reprimand against Mr. Marquez was issued as a national board decision, with board chairperson Zabinski stating he stood behind the discussions and process "100%" leading to the decision.  Minnesota members of the National Board, National President and National Chairperson failed to properly process the issue of Mr. Marquez' attendance via the following:

  i.  Failure to follow Constitutional process outlined in Bylaws, Paragraph 37, which calls for a committee to investigate issues pertaining to a local, and report back to the national board for discussion,
  ii.  Failure to conduct open/full board discussions under regular or special board session, before rendering a reprimand against Ace Marquez.
  iii.  Failure to provide Ace Marquez with ability to have representation.
  iv.  Failure to provide Ace Marquez or his Locals an opportunity or venue to respond to allegations.
  v.  Failure to answer question from Ace Marquez as to how his absence from National Board meeting was recorded in the national minutes.
  vi.  Failure to provide minutes from the national board meetings in a timely manner, particularly as it relates to this issue of most recent board meeting and minutes. At the time of this writing, no minutes have been provided.
  vii. Failure and refusal of National Board Chairperson to entertain requests from several members to hold further discussions and defer a decision on issues presented against Ace Marquez until the next scheduled board meeting.

## PAST FAILURES BY MINNESOTA'S MEMBERS OF THE
## NATIONAL BOARD OF DIRECTORS

4.   A.   A number of years ago, national president Doug Reese (MN), took employment actions against a National Representative, in direct violation of the Constitution, but only months later brought the matter before a full national board for review as a formality. President Reese's mistake was compounded by the fact that the national board allowed the action to stand, despite a challenge from the Michigan and California regions.

In a repeat of past actions, it appears very clear that Minnesota members of the national board had recently decided to eliminate an insurance benefit for Mr. Ace Marquez, and had decided this in pre-board discussion.  Presenting the issue to the full board appeared to be, again, a mere formality.   Minnesota members of the National Board, National President, and National Chairperson failed to properly process the insurance issue with Mr. Marquez via the following:

   a.   Failure to follow or acknowledge the employee policy handbook which states that "All employees" who are full time receive the insurance benefit.
   b.   Failure to modify the policy handbook before deciding to eliminate the benefit to Ace Marquez.
   c.   Failure to process a formal grievance filed by Ace Marquez.
   d.    Failure of national president to adequately represent Ace Marquez after he requested her to represent him.  Ms. Tulenchik accepted the role, but had Mr. Marquez engage in reported "busy work", that had little relevance to the issue at hand.  No timelines were established, and nothing further was processed after Mr. Marquez decided he would represent himself.

   B.    The Minnesota leadership apparently fails to understand conflicts of interest and the Constitution.  In November 2015 the Minnesota locals put forth Mr. Gary Walters for nomination to the national board.  Mr. Walters was at that time the union's Local 78 health plan insurance broker.  Objection was raised about potential conflict of interest in having a person who provides a service product (insurance) also becoming an authority on a board that makes decisions over contracted services.  There was also the question as to Mr. Walter's claim that he was a "dues paying member" as a board member requirement, per the Constitution.  Further, there was an issue as to whether Mr. Walters was part of a collective bargaining unit in the traditional sense, having wages and benefits from its contract, providing Mr. Walters the qualifications to run for office.  Mr. Walters argued that the Constitution didn't specifically prohibit him from being a board member, regardless of the conflict of interest claims.  During the national board meeting Mr. Walters promised to recuse himself on matters where there would be potential conflict.  Despite objection, the majority Minnesota national board members approved the nomination of Mr. Walters to the national board.  Mr. Walters immediately resigned from the position a day later, making the matter moot;

3

but, nonetheless, ignoring blatant conflicts of interest by the Minnesota national board members appears to be standard operating procedure.

C.      It appears clear that there was a cover-up of financial misdealing by a national representative.   On June 18, 2015 national representative Joni Tulenchik was reprimanded for misuse of the company credit card. Ms. Tulenchik used the card on hotel lodging in Minneapolis and a Park & Fly pass for a personal trip to Reno NV. The incident was verified through receipts and the credit card statement. The question was raised by staff at the national office.  When confronted with the evidence, Ms. Tulenchik readily admitted to the infraction, and agreed to pay back the amounts in question.  The Zeeland office received check reimbursement a short time later.  Ms. Tulenchik received a Step 1 Written Warning.  She later disagreed with the facts and evidence with the Minnesota Board members, although no formal grievance was filed.   Minnesota Board member David Larson disputed the disciplinary action months later during national board meeting on November 20, 2015.  After further board review and discussion, it was determined that the terms and conditions of the discipline would remain intact.  However, Minnesota board members, on their own, had the write-up deleted and expunged from the records and Ms. Tulenchik's personnel file.

## LACK OF COMMUNICATION FROM MINNESOTA MEMBERS RE: ISSUES DECIDED BY THE NATIONAL BOARD OF DIRECTORS

5.   The regional boards of California and Michigan also discussed a previous proposal to "invert" dues, in a manner similar to the California region. Initially, the Minnesota board members were 100% supportive of the concept.  The Minnesota region apparently had separate discussion and researched "Disaffiliation" (which was not what was proposed). During the following national board meeting, Minnesota voted 100% against the inversion of dues proposal – without much discussion or explanation other than "it's a bad idea."  The unwillingness to communicate with the full board has become a common hallmark since that board meeting two years ago.

## CONCLUSION

1.   **INTIMIDATION:** With regard to the overall tone and handling of above matters, MI / CA board members expressed the word "intimidation" on several occasions to define the tone and interactions of Minnesota board members to the other regions.  There is a common feeling and sense that the Minnesota region no longer cares about the thoughts or concerns of anyone outside of Minnesota – we will simply be outvoted.

4

2. **CHRISTIAN PRINCIPLES:** There was also discussion on the question of how much do the regions share in common with the Christian principles and values of the organization. For many union members and employers of Michigan and California, the Christian values embodied in the Constitution's Principles and Practices sections are of paramount importance. It is the very DNA of our organization, and what distinguishes us from other unions. Certain practices, such as holding meetings in casinos, have been brought to the national board's attention as being antithetical to the basis of Christian social principles. Constitution Article IV states, "These principles (Christian social principles) are based on, or directly derived from, creation laws and social teachings set forth in both the Old and the New Testaments of the Bible, and are given expression in society through observance of such creation laws and adherence to ethical relationships and standards that reflect such social teachings." This should not be interpreted as "our church is better than your church." The Michigan and California regions no longer wish to live in conflict with our principles, but instead desire to re-commit ourselves to the foundational Christian values created and instilled by our founders in 1931.

3. **BREAKDOWN IN RELATIONSHIP WITH MINNESOTA LEADERSHIP:** The MI/CA regions discussed the option of bringing charges against the Minnesota board officers. We would be trusting on a Constitutional process – and therein lies the dilemma. If the basis for the charges would be that Minnesota board officers have not followed a Constitutional process, there is no assurance the Minnesota board officers will start following a Constitutional process now. The Christian Labor Association has engaged in strategic planning meetings year after year, yet nothing seems to overcome the overall attitude of dislike or distrust the Minnesota locals have for the other regions. For some members this is a 20+ year history.

**<u>SOLUTION</u>**

Given all of the above considerations, the Michigan and California locals no longer wish to be in a relationship where the parties continue in perpetual conflict. It is clear from repeated failures that the Minnesota leadership is no longer interested in following the Constitution and bylaws. We have concluded that Minnesota would be much better off on its own, apart from Michigan and California. After researching the Constitutional bylaws, we find there is nothing prohibiting a separation. The Michigan and California offices hereby declare intent to separate relations from the Minnesota region.

To minimize legal expense and equitably conclude the proposed separation, we suggest the regions appoint an agreed-upon number of representatives to begin the process of separation. We also propose engaging the services of an agreed-upon mediator to avoid Court proceedings, as it is costly. We sincerely believe that a separation is in the best interest all regions.